## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| IN RE:<br><br>PORTABLE FLOOR RENTALS, INC.,<br><br>    Debtor. | Chapter 7 Case No. 04-41184<br><br>Judge Bonapfel |
| RONALD L. GLASS, CHAPTER 7<br>TRUSTEE FOR PORTABLE FLOOR<br>RENTALS, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>REED J. SEATON, ROBERT ALLISON,<br>KEVIN WEST, MAX C. CHAPMAN, JR.,<br>JAMES BRECKENRIDGE, TUDOR<br>ARBITRAGE PARTNERS L.P, TUDOR BVI<br>FUTURES, LTD.,<br><br>    Defendants. | Adversary Proceeding No. |

### TRUSTEE'S COMPLAINT TO SET ASIDE AND AVOID
### PREFERENCES AND FRAUDULENT CONVEYANCES,
### TO RECHARACTERIZE EQUITY FOR DAMAGES,
### TO EQUITABLY SUBORDINATE CLAIMS AND FOR OTHER RELIEF

Plaintiff Ronald L. Glass, Chapter 7 Trustee for American Sports Products Group, Inc. ("ASPG"), American Sports Systems, Inc. ("ASSI"), Southwest Recreational Industries, Inc. ("SRI"), AWS Construction, Inc. ("AWS"), E.J. Renner & Associates, d/b/a Malott Peterson Renner, Inc., ("E.J. Renner"), American Sports International, Ltd., d/b/a American Athletic, Inc. ("AAI"), Sport Court, Inc.("SCI") and Portable Floors, Inc. (hereinafter collectively the "Trustee")[1], herewith makes and files his Complaint to Set Aside and Avoid Preferential Payments and Fraudulent Conveyances, TO Recharacterize Equity for Damages, to Equitably

---

[1] ASPG, ASSI, SRI, E.J. Renner, AWS, AAI, SCI and Portable Floors shall be collectively referred to herein as the "Debtors".

Subordinate Claims and for Other Relief (the "Complaint") against defendants Reed J. Seaton ("Seaton"), Robert Allison ("Allison"), Kevin West ("West"), Max C. Chapman, Jr. ("Chapman"), James Breckenridge ("Breckenridge"), Tudor Arbitrage Partners L.P. ("Tudor Arbitrage"), Tudor BVI Futures, Ltd. ("Tudor BVI") (collectively, the "Defendants") and shows as follows:

## PRELIMINARY STATEMENT

This Adversary Proceeding seeks to avoid, set aside and recover damages and other relief in connection with large payments made to insiders of the Debtors and for mismanagement of the Debtors by one or more of the Defendants, each of whom was a shareholder, director, officer and/or employee of one or more of the Debtors.  As early as 2001 and continuing through the filing of these case, the Debtors suffered severe cash flow and liquidity problems.  Due to these problems, the secured lenders of the Debtors demanded that certain of the Defendants herein (with the exception of Allison and West) make substantial capital contributions in March of 2001.  However, by early 2002, the Debtors were once again out of cash and had fully exhausted their line of credit.  Instead of making capital contributions, these same Defendants made substantial loans, at high interest rates and with options to convert to equity, which were paid back almost immediately from the proceeds of a refinancing in June, 2002.  The total paid to the Defendants herein from the proceeds of this refinancing and in purported satisfaction of these short term "loans" was $3,185,669.13.  In addition, certain of the Defendants authorized additional payments in connection with promissory notes issued to shareholders and other insiders totaling $2,144,589.76, of which $1,200,000 was paid to Defendants Seaton, Allison and West.  At the time of these payments, however, the Debtors were collectively insolvent and substantially under-capitalized, problems which were only exacerbated and augmented by the

-2-

2002 Refinancing.  In addition, Defendants Seaton, Chapman and Breckenridge, who together controlled the Debtors and owned most of the stock of the Debtors' parent, managed and operated the Debtors in a manner which ignored the interests of creditors, ignored the Debtors' continuing financial problems and deepening insolvency and which was ultimately the proximate cause of the failure of the Debtor corporations thereby causing substantial damage.  This Complaint seeks the avoidance and recovery of certain payments to the Defendants, damages for breaches of fiduciary duties by Defendants Seaton, Chapman and Breckenridge, an accounting from Defendant Seaton, and the subordination of any and all claims which the Defendants may assert against any of the Debtors herein.

## PARTIES, JURISDICTION AND VENUE

1.      On August 11, 2004, Ronald L. Glass was appointed as Chapter 11 Trustee for ASPG, AAI and SCI.  On September 2, 2004, Ronald L. Glass was appointed as Trustee for Portable Floors, Inc.  On September 10, 2004, Ronald L. Glass was appointed as Trustee for SRI, AWS and E.J. Renner.  On October 14, 2005, each of the cases herein was converted to cases under Chapter 7 of the Bankruptcy Code and Mr. Glass was subsequently appointed as Chapter 7 Trustee.

2.      Ronald L. Glass is the duly authorized and acting Chapter 7 Trustee for the each of the Debtors named herein and maintains his offices at 3391 Peachtree Road, Suite 330, Atlanta, Georgia 30326.

3.      Reed J. Seaton is an individual residing in Travis County, Texas, at 11009 Pencewood Court, Austin, Texas 78750.  Seaton is subject to the jurisdiction of this Court.

4.      Robert Allison is an individual residing in Travis County, Texas, at 17700 North Rim Drive, Leander, Texas 78641.  Allison is subject to the jurisdiction of this Court.

ATLANTA:4797743.1

5.      Kevin West is an individual residing in Travis County, Texas, at 1800 Fall Creek Drive, Cedar Park, Texas 78613.  West is subject to the jurisdiction of this Court.

6.      Max C. Chapman, Jr. is an individual who maintains a residence in the State of Wyoming at Bar-B-Bar Ranch, 66 Sage Brush Drive, Moose, Wyoming 83012.  Mr. Chapman also maintains a place of business in the State of New York at 400 Park Avenue, Suite 2200, New York, New York 10022.  Chapman is subject to the jurisdiction of this Court.

7.      James C. Breckenridge is an individual residing at 1 Roger Drive, Greenwich, Connecticut 06831.  Breckenridge is subject to the jurisdiction of this Court.

8.      Tudor Arbitrage Partners L.P. ("Tudor Arbitrage") is a Delaware Limited Partnership and may be served with this Complaint through its Registered Agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  Tudor Arbitrage is subject to the jurisdiction of this Court.

9.      Tudor BVI Futures, Ltd. n/k/a The Tudor BVI Global Fund L.P. ("Tudor BVI") is a Delaware Limited Partnership which may be served with this Complaint through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware  19801.  Tudor BVI is subject to the jurisdiction of this Court.

10.     This Complaint is filed pursuant to 11 U.S.C. §§ 105, 544, 547, 548, 549 and 550; the Uniform Fraudulent Transfer Act or similar laws as enacted in the States of New York, Delaware, Texas and/or Georgia; other common and statutory laws of the States of New York, Delaware, Texas and/or Georgia; and Bankruptcy Rule 7001.

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

ATLANTA:4797743.1

12. This is a core proceeding pursuant to 28 U.S.C. § 157.

13. Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**FACTUAL BACKGROUND**

**A.** **Procedural History of the Bankruptcy Cases**

14. On February 13, 2004 (the "SRI Petition Date"), SRI and certain of its affiliates commenced bankruptcy cases in this Court by each filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

15. On March 17, 2004 (the "ASPG Petition Date"), each of ASPG, ASSI, SCI and AAI commenced bankruptcy cases in this Court by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the ASPG Petition Date and the SRI Petition Date shall be collectively referred to herein as the "Petition Dates").

16. From February 13, 2004 to and through September 10, 2004, SRI operated as a Debtor in Possession pursuant to Chapter 11 of the United States Bankruptcy Code.   On September 10, 2004, Ronald L. Glass was appointed as Chapter 11 Bankruptcy Trustee for SRI.

17. From March 14, 2004 to and through August 11, 2004, ASPG, ASSI, AAI and SCI operated as a Debtors in Possession pursuant to Chapter 11 of the United States Bankruptcy Code.  On August 11, 2004, Ronald L. Glass was appointed as Chapter 11 Bankruptcy Trustee for SRI and its affiliates.

18. On March 23, 2004, Portable Floors, Inc. filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code.  Ronald L. Glass was appointed as Chapter 11 Trustee for this entity on September 2, 2004 and continued to act as Chapter 7 Trustee for Portable Floors, Inc. from that date to and through October 14, 2005.

-5-

19.     On October 14, 2005, this Court converted each of the cases herein from cases under Chapter 11 of the Bankruptcy Code to cases under Chapter 7 of the Bankruptcy Code. Ronald L. Glass was subsequently appointed as Chapter 7 Trustee for each of the Debtors and a Bankruptcy Code § 341 Meeting of Creditors was held and concluded on December 12, 2005.

20.     Ronald L. Glass currently serves as the Chapter 7 Bankruptcy Trustee for each of SRI, ASPG, ASSI, AAI, SCI and Portable Floors.

**B.      History and Management of the Debtors.**

21.     ASPG is a Delaware Corporation which was formed in 1993 by certain financial investors, including Defendant Chapman, for the purpose of serving as a holding company for the planned acquisition of companies engaged in the business of the construction, sale and maintenance of sports related courts and/or in the sale of sporting goods and related products. Mr. Chapman held and/or controlled substantial ownership interests in ASPG either directly or through Defendants Tudor Arbitrage and Tudor BVI. Defendant Chapman remained as a member of the Board of Directors of ASPG to and through the Petition Dates.

22.     At or shortly after its formation in 1993, ASPG acquired American Athletic, Inc.

23.     ASPG subsequently acquired SCI in 1995. One of the financial investors in SCI was the United States subsidiary of the international investment banking firm UBS. Pursuant to the terms of the acquisition, UBS became a shareholder of ASPG and Defendant Breckenridge, an employee of UBS, was appointed to the Board of Directors of ASPG to essentially serve as UBS's representative on ASPG's Board. Defendant Breckenridge continued to serve on the Board of Directors of ASPG to and through the Petition Dates.

24.     SRI was originally a subsidiary of the Ritchey Corporation known as Ritchey Tennis and Track which was acquired in 1984 by Reed Seaton and others, including, upon

information and belief, Defendants Allison and West. SRI was engaged in the business of constructing, installing maintaining tracks and artificial turf fields. In 1993, SRI acquired the assets and business of Astroturf, Inc. including the "Astroturf" tradenames and marks.

25. From 1984 through 1996, Seaton served as the President of SRI and was responsible for the day to day management of SRI. Seaton also held an ownership interest in SRI.

26. From 1984 to 1996, Defendant Allison was an employee, officer and/or director of SRI and also held stock in SRI.

27. From 1984 to 1996, Defendant West was an employee, officer and/or director of SRI and also held stock in SRI.

28. In September, 1996, ASPG acquired SRI. Although ASPG had already acquired AAI and SCI, the acquisition of SRI was by far its largest acquisition. In exchange for their stock in SRI, each of Defendants Seaton, Allison and West received both stock in ASPG and promissory notes. Each of the Promissory Notes delivered to Defendants Seaton, Allison and West was in the principal amount of $333,333. These notes are attached hereto as Exhibits "1" through "3".

29. After ASPG acquired SRI, Seaton remained as the President of SRI and was also appointed to the Board of Directors of ASPG (the "ASPG Board") which became the parent corporation of SRI. Defendant Seaton remained on the ASPG Board through November, 2003.

30. From September, 1996 to and through the respective Petition Dates, ASPG acted as a holding company for and was the ultimate parent of each of AAI, SCI and SRI. Although AAI, SCI and SRI were operated separately, each of these companies were owned by ASPG and ultimately controlled by the management and board of ASPG.

ATLANTA:4797743.1

31.     Messrs. Seaton, Breckenridge and Chapman together owned or controlled the vast majority of voting stock of ASPG from and after ASPG's acquisition of SRI in 1996 and to and through the Petition Dates.  Consequently, during this same time period, Messrs. Seaton, Chapman and/or Breckenridge controlled ASPG and its subsidiaries and affiliates.

**C.    Financing, Capitalization and Additional Acquisitions.**

32.     In October, 1996, ASPG entered into a $40 Million syndicated credit facility provided by Heller Financial (the "First Secured Financing").

33.     From and after its acquisition of SRI and to and through June, 2002, ASPG, through SRI, completed nine (9) additional acquisitions through the purchase of stock or assets. The gross purchase price for these acquisitions was approximately $30 Million and was financed through approximately $18 Million of additional borrowings from Heller, approximately $7 Million in seller notes issues to shareholders of the acquired companies (the "Seller Notes")[2] and capital contributions from the ASPG shareholders of approximately $5 Million.

34.     In June, 1997, the First Secured Financing was amended through an "Amended and Restated Credit Agreement" to provide for financing for one of the nine acquisitions, the acquisition of Malott Peterson Renner, Inc. (the "First Amendment").  From and after this First Amendment, ASPG and Heller entered into a series of six (6) amendments or waivers with respect to the First Secured Financing which provided for, among other things, increased leverage, effective refinancing of existing term debt, reduction of financial performance requirement and eventually waiver of the default of the financial covenants.

---

[2] The Promissory Notes issued to Seaton, Allison and West at the time of ASPG's acquisition of SRI were also referred to as "Seller Notes" by the Debtors. Notes issued to shareholders in connection with acquisitions will generally be referred to herein as "Seller Notes".

ATLANTA:4797743.1

35.    With respect to the financial performance of the Debtors after the acquisition of SRI and to and through June, 2002, the Debtors' combined operating performance consistently deteriorated, primarily as the result of declining margins both at the gross profit and operating levels of SRI.  Compounding these operating difficulties was the increasing leverage and required debt service payments resulting from the increased borrowing under the First Secured Financing to finance the numerous acquisitions in which ASPG engaged in the late 1990's and early 2000's.

36.    Significantly, and due to the Debtors' aggressive acquisition strategy coupled with poor operating results, the First Secured Financing was amended by Heller in March, 2001 to require the shareholders of ASPG make a capital contribution of $3 Million (the "2001 Capital Contribution").  Heller imposed this requirement in order to cure and waive defaults of certain financial covenants then existing under the First Secured Financing.

37.    The plainly apparent business strategy of Seaton, Chapman and Breckenridge and of the other shareholders of the Debtors was to "roll up" several business units for ultimate sale to another company and thereby generate substantial profits for themselves and the shareholders of businesses acquired by ASPG.  This "roll up" was financed primarily through aggressive borrowing and through the use of promissory notes to the sellers of businesses acquired by ASPG.

38.    By late 2001, however, (i) the credit available to ASPG under the First Secured Financing was rapidly diminishing, (ii) no payments had been made under most of the Seller Notes, including the notes held by Seaton, Allison and West, (iii) business operations were poor or, at best, marginal and were not generating sufficient cash flow to reduce the obligations under the First Secured Financing and/or pay all or any portion of the Seller Notes; and (iv) no

-9-

potential purchaser was available to acquire the equity of ASPG and/or to pay all or any portion of the Seller Notes.

**D.    The 2002 Refinancing**

39.    As of early 2002, ASPG had virtually exhausted the credit available to it under the First Secured Financing.  In addition, the First Secured Financing was itself scheduled to expire in mid-2002.  Accordingly, the Debtors began to aggressively seek to refinance the First Secured Financing in early 2002.

40.    In addition, the Debtors were not generating sufficient cash flow to fund their combined operations and/or to made debt service payments due under the First Secured Financing.  However, since all of the 2001 Capital Contribution had been used to fund payments to its secured lender and since no additional capital contributions had been made, the Debtors did not have any capital reserves to fund the cash shortfalls generated from its business operations and/or to fund payments to its secured creditor.

41.    Accordingly, and in order to continue to fund its business operations and, in particular, to make required payments to its secured creditor pending a refinancing of the First Secured Facility, a cash infusion was required.  Unlike the 2001 Capital Contribution, and even though the Debtors were in even worse financial condition by 2002, the Debtors did not obtain additional capital contributions.  Instead the Debtors entered into high interest "Bridge Loans" with certain of their directors and shareholders to provide operating funds to the Debtors.

42.    On or around March 29, 2002, Defendant Seaton made a "Bridge Loan" to ASPG in the principal amount of $512,820.51 and, in return, ASPG delivered a "Convertible Subordinated Promissory Note" to Defendant Seaton dated April 1, 2002 (the "Seaton Convertible Note"), a true and correct copy of which is attached hereto as Exhibit "4".

-10-

43.     On or around March 29, 2002, Defendant Chapman made a "Bridge Loan" to ASPG in the principal amount of $1,282,051.29 and, in return, ASPG delivered a "Convertible Subordinated Promissory Note" to Defendant Chapman (the "Chapman Convertible Note"), a true and correct copy of which is attached hereto as Exhibit "5".

44.     On or around March 29, 2002, Defendant Tudor BVI made a "Bridge Loan" to ASPG in the principal amount of $853,846.15 and, in return, ASPG delivered a "Convertible Subordinated Promissory Note" to Defendant Tudor BVI (the "Tudor BVI Convertible Note"), a true and correct copy of which is attached hereto as Exhibit "6".

45.     On or around March 29, 2002, Defendant Tudor Arbitrage made a "Bridge Loan" to ASPG in the principal amount of $428,205.13 and, in return, ASPG delivered a "Convertible Subordinated Promissory Note" to Defendant Tudor Arbitrage (the "Tudor Arbitrage Convertible Note"), a true and correct copy of which is attached hereto as Exhibit "7".[3]

46.     The total amount loaned by Defendants Seaton, Chapman, Tudor BVI and Tudor Arbitrage and for which Convertible Notes were delivered was $3,076,923.08.  The terms of the Convertible Notes were identical.  Interest was to be paid on the principal sum due at the rate of fifteen percent (15%) per annum with repayment contemplated upon a refinancing of the Debtors.  Further, each of the holders of the Convertible Notes had the right to convert all monies loaned to Series A Preferred Stock of ASPG.

47.     However, only thirty to forty-five days after the "Bridge Loans" were made, the Debtors were once again running out of cash.  Consequently, in late April and May, 2002, the Debtors aggressively sought to (i) delay significant payments to vendors pending the planned

---

[3] The Seaton Convertible Note, Chapman Convertible Note, Tudor BVI Convertible Note and Tudor Arbitrage Note shall be collectively referred to herein as the "Convertible Notes".

ATLANTA:4797743.1

refinancing, (ii) pull in cash from foreign subsidiaries, and (iii) to resolve all outstanding receivables.

48.    From at least April, 2002 and to and through the completion of the refinancing in June, 2002, the Debtors were generally unable to pay their debts as and when they became due and payable.

49.    In connection with their efforts to refinance the First Secured Financing, the Debtors generally represented that they were solvent on a balance sheet basis.  However, this solvency was based primarily upon the Debtors' own valuation of its corporate goodwill, generated primarily from its prior acquisitions.  The Debtor valued its goodwill at $30 Million based primarily on the acquisitions listed above.  Upon information and belief, this valuation of the goodwill was overstated and by at least April, 2002, the Debtors were insolvent on a balance sheet basis in that the fair market value of their assets was less than their total liabilities and/or as a going concern.

50.    Upon information and belief, based upon the need for the Bridge Loans and the overstatement of goodwill, by at least April, 2002, the Debtors' were in violation of the following covenant contained in the First Secured Financing, specifically at Section 5.9 of the 1997 Amendment which stated :

> Each borrower:  (a) owns and will own assets the fair saleable value of which are (i) greater than the total amount of liabilities (including contingent liabilities) of such Borrower and (ii) greater than the amount that will be required to pay the probable liabilities of such borrowers then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such borrowers; (b) has capital that is not unreasonably small in relation to its business has presently conducted or after giving effect to any contemplated transaction; and (c) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they come due.

-12-

51.     On June 26, 2002, the Debtors closed on a refinancing of the First Secured Financing through a certain Second Amended and Restated Credit Agreement, dated as of June 26, 2002, with Heller as Agent (hereinafter the "Senior Secured Facility") and through a new unsecured, mezzanine facility (hereinafter the "Mezzanine Facility").

52.     The closing of the Senior Secured Facility and of the Mezzanine Facility took place in the State of New York.

53.     The funds disbursed pursuant to the Senior Secured Facility and the Mezzanine Facility were disbursed from bank accounts located in the State of New York.

54.     Upon information and belief, the Blackstone Defendants, the largest participants in the Mezzanine Facility, and one of the largest unsecured creditors in these Chapter 11 cases, maintain their offices in New York.

55.     The agreements relating to both the Senior Secured Facility and the Mezzanine Facility were controlled by New York law.

56.     With respect to the Mezzanine Facility, the Debtors and certain of their affiliates issued to the Blackstone Defendants and GECC (together, the "Senior Subordinated Creditors") senior subordinated notes in the aggregate principal amount of approximately $21,000,000 (the "Senior Subordinated Notes") and warrants to purchase ASPG stock pursuant to a certain Note and Warrant Purchase Agreement (the "Note and Warrant Purchase Agreement").

57.     Approximately $13 Million of the proceeds of the Senior Subordinated Notes were used to pay down the Senior Secured Facility to create additional borrowing capacity thereunder.  Approximately $2 Million of these proceeds were used to pay fees and expense associated with the refinancing.  $5,330,258 of the proceeds was used to satisfy the Bridge Loans and to pay certain Seller Notes, including obligations owed to Defendants Seaton, Allison and

West.  Attached hereto as Exhibit "8" is a document prepared at the closing and attached to the loan documents setting forth the "Sources and Uses of Funds" for not only the proceeds of the Senior Subordinated Notes but also for the proceeds of Senior Secured Financing.

58.    With respect to the Bridge Loans, Defendant Seaton received a payment of $530,944.85 in full satisfaction of the obligations purportedly due to him pursuant to the Seaton Convertible Note, netting a two month profit of approximately $20,000.  Defendant Chapman received a payment of $1,327,362.14, netting a short term profit of nearly $40,000.  Tudor BVI and Tudor Arbitrage also received payment in full and also, together, netted a short term profit of almost $40,000.

59.    With respect to the Seller Notes, Seaton, Allison and West each cancelled their Subordinated Promissory Notes and each received a cash payment of $400,000.  In addition, they each received new promissory notes, each of which was titled: "Subordinated Promissory Note" (the "Subordinated Notes").  The Subordinated Notes are attached hereto as Exhibits "9", "10" and "11" and each is in the principal amount of $467,682.22.

60.    In addition to the amounts paid to Seaton, Allison and West, an additional $944,589 was distributed to shareholders holding Seller Notes as set forth in Exhibit 8.  All told, and despite the Debtors' serious cash flow problems and lack of adequate capital, $5,330,258 of the Senior Subordinated Note proceeds were paid to shareholders, directors, officers and other insiders.

61.    Defendants, Seaton, Chapman and Breckenridge each had knowledge of the Debtors' serious cash flow problems and lack of adequate capitalization.  Despite this, each approved and authorized the 2002 refinancing, the repayment of the Convertible Notes and the Seller Note payments.

ATLANTA:4797743.1

62.    According to information received by the Trustee from The Blackstone Defendants and GECC, the primary issuers of the Senior Subordinated Notes, the aggregate principal amount outstanding on the Senior Subordinated Notes on the SRI Petition Date was at least $23,821,359.98.  Thus, not only are the holders of the Senior Subordinated Notes still owed the principal sums loaned by them to the Debtors, the Debtors were unable to make all of the required interest payments due prior to the Petition Dates.  At present, and without taking into account any recoveries in this action, the Trustee estimates that the holders of the Senior Subordinated Notes will receive only a fraction of the monies owed to them in these Chapter 7 Cases.

**E.    The Aftermath**

63.    Ultimately, the refinancing did not cure the Debtors' operational difficulties and the Debtors never cured either their serious cash flow problems or their lack of adequate capital reserves.  In addition, by virtue of the combination of the overstated goodwill contained in the Debtors' balance sheets and additional borrowings, the Debtors' balance sheet insolvency was deepened as a result of the refinancing and continued to deepen to and through the Petition Dates.

64.    By mid-2003, just one year after the refinancing, the Debtors had again largely exhausted the credit available to them under the Senior Secured Facility and were again in default of certain financial covenants established therein.  By late 2003, Heller, as Agent, had asserted dominion over the Debtors' cash as authorized by its agreements and had directed the Debtors to cease making interest payments to the holders of the Senior Subordinated Notes.  By early 2004, less than two years after the 2002 Refinancing, each of the Debtors' sought voluntary bankruptcy protection.

ATLANTA:4797743.1

G.     **The Seaton Separation Agreement**

65.     In late 2003, the Debtors terminated Seaton's employment.  Even though the Debtors were in default of their obligations to Heller as Agent and to the Mezzanine Lenders, Seaton sought and obtained generous severance terms.

66.     Prior to Seaton's termination, his job duties and status changed several times due largely to disputes between Seaton and the Board of Directors of ASPG.  In early 2003, the ASPG Board, under the direction and control of Defendants Chapman and Breckenridge, removed Seaton as the President of SRI.  Seaton did remain as President of ASPG.  A new president was then hired for SRI.  Certain other management changes were made to SRI which resulted in the hiring of a new, and unqualified, Chief Financial Officer and a new Controller for SRI.

67.     The consequences of the management changes at SRI were disastrous for the Debtors.  By mid-2003, and within six months of the dramatic management changes at SRI, the ASPG Board, under the direction and control of Defendants Breckenridge and Chapman, removed the new president of SRI and re-installed Seaton as President of both ASPG and SRI.

68.     By November, 2003, only a few month later, the ASPG Board, in yet another about-face directed by Defendants Chapman and Breckenridge, decided to terminate Defendant Seaton as an employee of both SRI and ASPG and, in connection with this termination, granted Defendant Seaton extremely generous and undeserved severance and compensation benefits.

69.     On November 21, 2003, Seaton entered into a Separation Agreement and General Release with ASPG, SRI and "all past and present parents, affiliates and subsidiaries" thereof. ASPG and SRI were the only signatories of this Agreement.  Pursuant to this Agreement, Mr. Seaton was given a total severance package valued at approximately $600,000 from the Debtors.

ATLANTA:4797743.1

On the date the Separation Agreement was executed, the Debtors were insolvent and were in default of their obligations under both the Senior Secured Facility and the Senior Subordinated Notes.

70.     Commencing from November 21, 2003 to February 13, 2004, the date on which SRI filed its petition, Seaton received a total of $169,584.27 on account of the obligations of SRI and ASPG pursuant to this Agreement.  Of this, $67,316 constituted gross severance payments made by SRI (See Exhibit "12" hereto); $64,000 constituted payments for preferred stock from ASPG, of which $32,000 was made within 90 days of the ASPG filing date (See Exhibit "13" hereto); $33,335.34 constituted an office expense reimbursement from SRI (See Exhibit "14" hereto); and $4,932.93 constituted a payment for unpaid sick/vacation leave from ASPG (See Exhibit "15" hereto).

71.     In addition, Seaton received a severance payment in the gross amount of $16,829 from SRI on February 14, 2004, one day after the SRI Petition was filed.  (See Exhibit "16" hereto).  This payment was made on account of Seaton's pre-petition Separation Agreement and was not authorized by the Bankruptcy Court.

72.     Among the terms and conditions of the Separation Agreement was a requirement that Seaton not compete with the Debtors and not disclose confidential information of the Debtors.  Shortly after executing the Severance Agreement, however, Seaton established a new business, Hellas Construction, Inc. which, in fact, was a direct competitor of the Debtors.  In addition, upon information and belief, Seaton contacted and hired employees of the Debtors and disclosed confidential information, as defined in the Separation Agreement, to them.

-17-

### TRUSTEE'S CLAIMS AND CAUSES OF ACTION

### COUNT I
### FRAUDULENT CONVEYANCE AND IMPROPER
### DIVIDEND AS TO DEFENDANT ROBERT ALLISON

73.     The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

74.     The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the $400,000 payment made to Allison from the proceeds of the 2002 refinancing (the "Allison Transfer").

75.     The Allison Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtor.

76.     Alternatively, at the time of the Allison Transfer,

    (a)     The Debtors were or were thereby rendered insolvent; or

    (b)     The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

    (c)     The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the Allison Transfer was unreasonably small and was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

77.     Alternatively, the Allison Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the Allison Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

ATLANTA:4797743.1

78.    Accordingly, the Trustee asserts that the Allison Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the Allison Transfer and for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

### COUNT II
### FRAUDULENT CONVEYANCE AND IMPROPER
### DIVIDEND AS TO DEFENDANT KEVIN WEST

79.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

80.    The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the $400,000 payment made to West from the proceeds of the 2002 refinancing (the "West Transfer").

81.    The West Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtor.

82.    Alternatively, at the time of the West Transfer,

(a)    The Debtors were or were thereby rendered insolvent; or

(b)    The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

(c)    The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the West Transfer was unreasonably small and was engaged or was about to engage

-19-

in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

83.     Alternatively, the West Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the West Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

84.     Accordingly, the Trustee asserts that the West Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the West Transfer, for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

**COUNT III**
**FRAUDULENT CONVEYANCE AND IMPROPER DIVIDEND AS**
**TO SEATON WITH RESPECT TO THE SELLER NOTE  PAYMENT**

85.     The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

86.     The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the $400,000 payment made to Seaton from the proceeds of the 2002 refinancing in connection with Seaton's Seller Note (the "Seaton Seller Note Transfer").

87.     The Seaton Seller Note Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtors.

88.     Alternatively, at the time of the Seaton Seller Note Transfer,

(d)     The Debtors were or were thereby rendered insolvent; or

ATLANTA:4797743.1

(e)     The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

(f)     The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the Seaton Seller Note Transfer was unreasonably small and was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

89.     Alternatively, the Seaton Seller Note Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the Seaton Seller Note Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

90.     Accordingly, the Trustee asserts that the Seaton Seller Note Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the Seaton Seller Note Transfer and for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

**COUNT IV**
**FRAUDULENT CONVEYANCE AND IMPROPER DIVIDEND AS
TO SEATON WITH RESPECT TO BRIDGE LOAN  PAYMENT**

91.     The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

-21-

92.    In connection with the June, 2002 refinancing, Seaton received a payment of $530,944.85 (the "Seaton Bridge Loan Transfer") in purported satisfaction of the obligations of the Seaton Convertible Note.

93.    The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the Seaton Bridge Loan Transfer.

94.    The Seaton Bridge Loan Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtors.

95.    Alternatively, at the time of the Seaton Bridge Note Transfer,

(a)    The Debtors were or were thereby rendered insolvent; or

(b)    The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

(c)    The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the Seaton Bridge Loan Transfer was unreasonably small and was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

96.    Alternatively, the Seaton Bridge Loan Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the Seaton Bridge Loan Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

97.    Accordingly, the Trustee asserts that the Seaton Bridge Loan Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the

-22-

Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the Seaton Bridge Loan Transfer and for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

**COUNT V**
**RECHARACTERIZATION OF BRIDGE LOAN AS CAPITAL**
**CONTRIBUTION WITH RESPECT TO DEFENDANT SEATON.**

98.     The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

99.     The amounts loaned by Defendant Seaton as set forth in the Seaton Convertible Note (the "Seaton Bridge Loan") were intended by Seaton and the Debtors to an equity investment by Seaton and the Debtors.

100.    To the extent that the advance of the Seaton Bridge Loan has been characterized by Seaton as debt, it should be recharacterized from debt to equity because:

(a)     Seaton participated in the management of the Debtors and, in particular, participated in the management decisions relative to the 2002 refinancing and use of the proceeds thereof;

(b)     the Seaton Bridge Loan Transfer was treated separately from the amounts paid to regular corporate creditors of the Debtors;

(c)     Seaton and the Debtors intended the Bridge Loan to be an equity investment by Seaton and the Debtors;

(d)     the Debtors were thinly or inadequately capitalized at the time of the advances;

(e)     the Debtors were insolvent both at the time of the Seaton Bridge Loan and at the time of the Seaton Bridge Loan Transfer;

-23-

(f)     the Debtors were unable to obtain loans to fund its operations on a regular basis and were therefore required to look to insiders for funds for operating expenses; and

(g)     the Seaton Bridge Loan was used to finance losses related to acquisitions of capital assets.

101.    The Trustee respectfully prays for the entry of an Order declaring the Seaton Bridge Loan to be re-characterized as equity, declaring the re-payment of the Seaton Bridge Loan to be a conveyance or transfer and in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 or similar applicable provision and entering judgment against Seaton and in favor of the Trustee in the principal amount of $530,944.85, together with punitive damages pre and post judgment interest, costs and attorneys' fees.

**COUNT VI**
**FRAUDULENT CONVEYANCE AND IMPROPER DIVIDEND AS**
**TO CHAPMAN WITH RESPECT TO BRIDGE LOAN  PAYMENT**

102.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

103.    In connection with the June, 2002 refinancing, Defendant Chapman received a payment of $1,327,362.14 (the "Chapman Bridge Loan Transfer") in purported satisfaction of the obligations of the Chapman Convertible Note.

104.    The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the Chapman Bridge Loan Transfer.

105.    The Chapman Bridge Loan Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtors.

106.    Alternatively, at the time of the Chapman Bridge Loan Transfer,

-24-

(a)     The Debtors were or were thereby rendered insolvent; or

(b)     The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

(c)     The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the Chapman Bridge Loan Transfer was unreasonably small and was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

107.    Alternatively, the Chapman Bridge Loan Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the Chapman Bridge Loan Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

108.    Accordingly, the Trustee asserts that the Chapman Bridge Loan Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the Chapman Bridge Loan Transfer and for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

ATLANTA:4797743.1

## COUNT VII
## RECHARACTERIZATION OF BRIDGE LOAN AS CAPITAL
## CONTRIBUTION WITH RESPECT TO DEFENDANT CHAPMAN

109.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

110.    The amounts loaned by Defendant Chapman as set forth in the Chapman Convertible Note (the "Chapman Bridge Loan") were intended by Chapman and the Debtors to an equity investment by Chapman and the Debtors.

111.    To the extent that the advance of the Chapman Bridge Loan has been characterized by Chapman as debt, it should be recharacterized from debt to equity because:

(a)    Chapman participated in the management of the Debtors and, in particular, participated in the management decisions relative to the 2002 refinancing and use of the proceeds thereof;

(b)    the Chapman Bridge Loan Transfer was treated separately from the amounts paid to regular corporate creditors of the Debtors;

(c)    Chapman and the Debtors intended the Chapman Bridge Loan to be an equity investment by Chapman and the Debtors;

(d)    the Debtors were thinly or inadequately capitalized at the time of the advances;

(e)    the Debtors were insolvent both at the time of the Chapman Bridge Loan and at the time of the Chapman Bridge Loan Transfer;

(f)    the Debtors were unable to obtain loans to fund its operations on a regular basis and were therefore required to look to insiders for funds for operating expenses; and

ATLANTA:4797743.1

(g)    the Chapman Bridge Loan was used to finance losses related to acquisitions of capital assets.

112.    The Trustee respectfully prays for the entry of an Order declaring the Chapman Bridge Loan to be re-characterized as equity, declaring the re-payment of the Chapman Bridge Loan to be a conveyance or transfer and in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 or similar applicable provision and entering judgment against Defendant Chapman and in favor of the Trustee in the principal amount of $1,327,362.14, together with punitive damages pre and post judgment interest, costs and attorneys' fees.

## COUNT VIII
## FRAUDULENT CONVEYANCE AND IMPROPER DIVIDEND AS TO TUDOR ARBITRAGE WITH RESPECT TO BRIDGE LOAN PAYMENT

113.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

114.    In connection with the June, 2002 refinancing, Defendant Tudor Arbitrage received a payment of $443,338.96 (the "Tudor Arbitrage Bridge Loan Transfer") in purported satisfaction of the obligations of the Tudor Arbitrage Convertible Note.

115.    The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the Tudor Arbitrage Bridge Loan Transfer.

116.    The Tudor Arbitrage Bridge Loan Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtors.

117.    Alternatively, at the time of the Tudor Arbitrage Bridge Note Transfer,

(a)    The Debtors were or were thereby rendered insolvent; or

ATLANTA:4797743.1

(b)     The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

(c)     The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the Tudor Arbitrage Bridge Loan Transfer was unreasonably small and was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

118.    Alternatively, the Tudor Arbitrage Bridge Loan Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the Tudor Arbitrage Bridge Loan Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

119.    Accordingly, the Trustee asserts that the Tudor Arbitrage Bridge Loan Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the Tudor Arbitrage Bridge Loan Transfer and for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

**COUNT IX**
**RECHARACTERIZATION OF BRIDGE LOAN AS CAPITAL**
**CONTRIBUTION WITH RESPECT TO DEFENDANT TUDOR ARBITRAGE**

120.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

ATLANTA:4797743.1

121.    The amounts loaned by Defendant Seaton as set forth in the Tudor Arbitrage Convertible Note (the "Tudor Arbitrage Bridge Loan") were intended by Tudor Arbitrage and the Debtors to an equity investment by Tudor Arbitrage and the Debtors.

122.    To the extent that the advance of the Tudor Arbitrage Bridge Loan has been characterized by Tudor Arbitrage as debt, it should be recharacterized from debt to equity because:

(a)    Tudor Arbitrage, directly and/or through Defendant Chapman, participated in the management of the Debtors and, in particular, participated in the management decisions relative to the 2002 refinancing and use of the proceeds thereof;

(b)    the Tudor Arbitrage Bridge Loan Transfer was treated separately from the amounts paid to regular corporate creditors of the Debtors;

(c)    Tudor Arbitrage and the Debtors intended the Tudor Arbitrage Bridge Loan to be an equity investment by Tudor Arbitrage and the Debtors;

(d)    the Debtors were thinly or inadequately capitalized at the time of the advances;

(e)    the Debtors were insolvent both at the time of the Tudor Arbitrage Bridge Loan and at the time of the Tudor Arbitrage Bridge Loan Transfer;

(f)    the Debtors were unable to obtain loans to fund its operations on a regular basis and were therefore required to look to insiders for funds for operating expenses; and

(g)    the Tudor Arbitrage Bridge Loan was used to finance losses related to acquisitions of capital assets.

-29-

123.    The Trustee respectfully prays for the entry of an Order declaring the Tudor Arbitrage Bridge Loan to be re-characterized as equity, declaring the re-payment of the Tudor Arbitrage Bridge Loan to be a conveyance or transfer and in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 or similar applicable provision and entering judgment against Tudor Arbitrage and in favor of the Trustee in the principal amount of $443,338.96, together with punitive damages pre and post judgment interest, costs and attorneys' fees.

**COUNT X**
**FRAUDULENT CONVEYANCE AND IMPROPER DIVIDEND AS
TO TUDOR BVI WITH RESPECT TO BRIDGE LOAN  PAYMENT**

124.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

125.    In connection with the June, 2002 refinancing, Defendant Tudor BVI received a payment of $884,023.18 (the "Tudor BVI Bridge Loan Transfer") in purported satisfaction of the obligations of the Tudor BVI Convertible Note.

126.    The Debtors did not receive fair consideration, or fair or reasonably equivalent value, in exchange for the Tudor BVI Bridge Loan Transfer.

127.    The Tudor BVI Bridge Loan Transfer was made with the actual intent to hinder, delay or defraud creditors or future creditors of the Debtors.

128.    Alternatively, at the time of the Tudor BVI Bridge Note Transfer,

(1)    The Debtors were or were thereby rendered insolvent; or

(2)    The Debtors intended that Debtors would incur, or believed or reasonably should have believed that the Debtors would incur debts beyond their ability to pay as they became due; or

-30-

ATLANTA:4797743.1

(3)     The Debtors were engaged or were about to engage in a business or transaction for which the remaining capital in its hands after the Tudor BVI Bridge Loan Transfer was unreasonably small and was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

129.    Alternatively, the Tudor BVI Bridge Loan Transfer was a dividend made at a time when (i) the Debtors' assets did not exceed its total liabilities and (ii) the assets of the Debtors remaining after the Tudor BVI Bridge Loan Transfer were not sufficient to pay all debts of the Debtor as required by applicable law.

130.    Accordingly, the Trustee asserts that the Tudor BVI Bridge Loan Transfer is a conveyance and/or transfer in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 and hereby demands a judgment in his favor avoiding the Tudor BVI Bridge Loan Transfer and for compensatory and punitive damages, together with pre and post judgment interest, costs and attorneys' fees.

**COUNT XI**
**RECHARACTERIZATION OF BRIDGE LOAN AS CAPITAL**
**CONTRIBUTION WITH RESPECT TO DEFENDANT TUDOR BVI**

131.    The Trustee realleges and incorporate each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

132.    The amounts loaned by Defendant Tudor BVI as set forth in the Tudor BVI Convertible Note (the "Tudor BVI Bridge Loan") were intended by Tudor BVI and the Debtors to an equity investment by Tudor Arbitrage and the Debtors.

133.    To the extent that the advance of the Tudor BVI Bridge Loan has been characterized by Tudor BVI as debt, it should be recharacterized from debt to equity because:

-31-

(a)     Tudor BVI, directly and/or through Defendant Chapman, participated in the management of the Debtors and, in particular, participated in the management decisions relative to the 2002 refinancing and use of the proceeds thereof;

(b)     the Tudor BVI Bridge Loan Transfer was treated separately from the amounts paid to regular corporate creditors of the Debtors;

(c)     Tudor BVI and the Debtors intended the Tudor BVI Bridge Loan to be an equity investment by Tudor BVI and the Debtors;

(d)     the Debtors were thinly or inadequately capitalized at the time of the advances;

(e)     the Debtors were insolvent both at the time of the Tudor BVI Bridge Loan and at the time of the Tudor BVI Bridge Loan Transfer;

(f)     the Debtors were unable to obtain loans to fund its operations on a regular basis and were therefore required to look to insiders for funds for operating expenses; and

(g)     the Tudor BVI Bridge Loan was used to finance losses related to acquisitions of capital assets.

134.    The Trustee respectfully prays for the entry of an Order declaring the Tudor BVI Bridge Loan to be re-characterized as equity, declaring the re-payment of the Tudor BVI Bridge Loan to be a conveyance or transfer and in fraud of the rights of the Debtors' creditors under §544(b) of the Bankruptcy Code and applicable state law and/or an unlawful dividend under 8 Del. C. §170 or similar applicable provision and entering judgment against Tudor BVI and in

ATLANTA:4797743.1

favor of the Trustee in the principal amount of $443,338.96, together with punitive damages pre and post judgment interest, costs and attorneys' fees.

**COUNT XII**
**BREACH OF FIDUCIARY DUTIES WITH RESPECT TO USE OF**
**PROCEEDS FROM 2002 REFINANCING AGAINST SEATON,**
**CHAPMAN AND BRECKENRIDGE JOINTLY AND SEVERALLY**

135.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

136.    The Debtors were collectively insolvent on a balance sheet basis before the issuance of the Bridge Loans, the closing of the 2002 Refinancing and the payments of the proceeds of the 2002 refinancing to directors, officers, shareholders and other insiders as set forth herein.

137.    The Debtors were rendered collectively insolvent by the terms of the 2002 Refinancing and/or the payments of the proceeds of the 2002 Refinancing to directors, officers, shareholders and other insiders as set forth herein.

138.    The Debtors were unable to pay their debts as they came due prior to and after the Bridge Loans and prior to and after the 2002 Refinancing.

139.    Pursuant to applicable state law, at the time that Defendants Seaton, Chapman and Breckenridge authorized and directed the payments of the Bridge Loans and Seller Notes as forth in Exhibit 8, the Debtors were insolvent or in the vicinity of the zone of insolvency such that Defendants Seaton, Chapman and Breckenridge, individually and collectively, owed a fiduciary duty of loyalty and good faith to the Debtors and the creditors of the Debtors.

140.    In authorizing and directing the payment of $5,330,258.89 to themselves and to directors, officers, employees and shareholders of the Debtors as set forth in Exhibit 8, Defendants Seaton, Chapman and Breckenridge, individually and collectively, acted for their

ATLANTA:4797743.1

own pecuniary benefit and/or for the pecuniary benefit of fellow directors and shareholders and with complete disregard of the Debtors' insolvency, serious cash flow problems, inadequate capitalization and of the interests of the Debtors' creditors.  In doing so, Defendants Seaton, Chapman and Breckenridge, individually and collectively, breached their fiduciary duties.

141.   As a consequence of this breach of fiduciary duties by Defendants Seaton, Chapman and Breckenridge, individually and collectively, they proximately caused damages in the principal sum of at least $5,330,258.89.  The Trustee respectfully prays for a judgment for compensatory damages against Defendants Seaton, Chapman and Breckenridge, jointly and severally, in an amount to be determined at the trial of this case from breaches of their fiduciary duties at times when the Debtors were insolvent or in the zone of insolvency, together with punitive damages, pre and post judgment interest, attorneys fees and costs.

### COUNT XIII
### IMPERMISSIBLE AND PREFERENTIAL PAYMENTS AS TO DEFENDANTS SEATON, CHAPMAN, TUDOR ARBITRAGE AND TUDOR BVI

142.   The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72, and 136 through 141 above as if fully set forth herein.

143.   Due to insolvency and/or potential insolvency of the Debtors, the proceeds of the 2002 Refinancing were, in fact, and should be treated as "trust funds" to be administered by the Debtors' Boards of Directors in accordance with their duties as directors of an insolvent company or a company in the "zone of insolvency".

144.   Tudor Arbitrage and Tudor BVI were, at all times relevant hereto, under the control and direction of Defendant Chapman and/or acting in concert or cooperation with him.

145.   The amounts paid to Seaton, Chapman, Tudor Arbitrage and Tudor BVI from the proceeds of the 2002 Refinancing, as set forth in Exhibit 8, were improper payments and/or impermissible preferential payments of trust funds made to directors or persons under the control

-34-

of the directors at the time that the Debtors were insolvent.  The Trustee respectfully prays for a judgment avoiding each and every transfer to Seaton, Chapman, Tudor Arbitrage and Tudor BVI, respectively, as set forth in Exhibit 8, for compensatory damages in the amount each of Seaton, Chapman, Tudor Arbitrage and Tudor BVI received, for pre- and post-judgment interest, costs and attorneys fees and all other damages allowed by law.

COUNT XIV

**AVOIDANCE OF IMPROPER POST-PETITION
PAYMENT MADE TO DEFENDANT SEATON**

146.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

147.    On February 14, 2004, SRI transferred the gross amount of $16,829 from SRI on February 14, 2004, one day after the SRI Petition was filed (the "February 14 Transfer").  Such payment was made on account of a pre-petition Separation Agreement entered into by and between Seaton and SRI.

148.    A true and correct copy of electronic payment receipt for the February 14 Transfer is attached hereto as Exhibit 16.

149.    No Bankruptcy Court approval was obtained for the February 14 Transfer.

150.    Accordingly, the Trustee asserts that the February 14 Transfer was an improper post-petition payment in violation of §549 of the Bankruptcy Code and the Trustee hereby demands a judgment in his favor avoiding this payment and in the principal amount of $16,829 together with pre and post judgment interest and costs against Defendant Seaton.

ATLANTA:4797743.1

## COUNT XV
## AVOIDANCE OF SEATON SEPARATION AGREEMENT AS
## FRAUDULENT CONVEYANCE

151.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs  through  above as if fully set forth herein.

152.    At all times relevant hereto, Seaton was an insider as defined in §101(31).

153.    On November 21, 2003,. Seaton entered into a Separation Agreement and General Release with ASPG and SRI.

154.    Attached hereto as Exhibit 17 is a chart listing each and every of the payments made to Defendant Seaton by date and by the Debtor from which such transfers were made and for which avoidance is requested herein.

155.    Such agreement was entered into one year prior to the respective Petition Dates and the payments made pursuant thereto and for which avoidance is sought herein are summarized on Exhibit 17.

156.    As of the Date of the Seaton Separation Agreement, ASPG and SRI and any other Debtor which may be a party thereto were insolvent.

157.    Neither ASPG nor SRI nor any other Debtor which may be a party to the Seaton Separation Agreement received fair consideration, or fair or reasonably equivalent value, in exchange for entering into the Separation Agreement.

158.    The Seaton Separation Agreement and/or the payments made pursuant to the Separation Agreement were made and/or entered into with the actual intent to hinder, delay and defraud creditors.

159.    Accordingly, the Trustee requests an Order from this Court avoiding the Seaton Separation Agreement and/or avoiding the payments listed in Exhibit 17 as fraudulent conveyances pursuant to §548 of the Bankruptcy Code and/or pursuant to applicable state law.

ATLANTA:4797743.1

The Trustee requests a declaration that the Seaton Separation Agreement is null and void, for damages in the principal amount of $169,584.27, and pre and post-judgment interest and costs.

## COUNT XVI
## AVOIDANCE OF SEATON SEPARATION
## AGREEMENT AS PREFERENTIAL TRANSFER

160.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

161.    At all times relevant hereto, Seaton was an insider as defined in §101(31) of the Bankruptcy Code.

162.    The Seaton Separation Agreement was entered into one year prior to the dates on which ASPG and SRI filed their respective bankruptcy petitions.

163.    As set forth in Exhibit 17, the total amount of payments made to Defendant Seaton within the one year, insider preference period in connection with the Seaton Separation Agreement is $169,584.27.

164.    The Seaton Separation Agreement and/or each and every one of the payments made to Seaton by certain of the Debtors pursuant to the Seaton Separation Agreement as set forth in Exhibit 17 were (i) for the benefit of Seaton, a creditor of the Debtors; (ii) for or on account of antecedent debt then owed to Seaton, (iii) made while the Debtors were insolvent; (iv) within one year of the ASPG and SRI petition dates and (v) which enabled Seaton to receive more than Seaton would have received if this were a case under Chapter 7 of the Bankruptcy Code, had the transfer not been made and Seaton received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

165.    Accordingly, the Trustee requests an Order from this Court avoiding the Seaton Separation Agreement and/or any and all payments made to Seaton thereunder as preferential

ATLANTA:4797743.1

transfers pursuant to §547 of the Bankruptcy Code.  The Trustee requests damages in the principal amount of $169,584.27, and pre and post-judgment interest and costs.

### COUNT XVII
### DAMAGES FOR BREACH OF THE
### SEATON SEPARATION AGREEMENT

166.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

167.    This claim is asserted in alternative to the relief sought in Counts XV and XVI.

168.    Section 11 of the Seaton Separation Agreement required that Seaton refrain from competing with the Debtors during the period in which he was receiving severance payments from the Debtor.

169.    Section 10 of the Seaton Separation Agreement required that Seaton not disclose any of the Debtors' trade secrets or confidential information.

170.    Upon information and belief, Seaton breached the terms of the Seaton Separation Agreement by, among other things, and including but not limited to, competing with the Debtors in express violation of the Seaton Separation Agreement and disclosing confidential information of the Debtors.

171.    Seaton's breaches of the Separation Agreement proximately caused damages to the Debtors.

172.    Accordingly, the Trustee hereby demands that he be awarded compensatory damages from Seaton to compensate the Debtors for the damage caused by Seaton in an amount to be determined at the trial of this case and for pre and post judgment interest, attorneys fees and costs.

ATLANTA:4797743.1

## COUNT XVIII
## BREACH OF FIDUCIARY DUTY WITH RESPECT TO SEATON SEPARATION AGREEMENT AGAINST DEFENDANTS CHAPMAN AND BRECKENRIDGE, JOINTLY AND SEVERALLY

173.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

174.    Chapman and Breckenridge, as the controlling shareholders and directors of the Debtors as of November, 2003 authorized, directed and/or negotiated the Seaton Separation Agreement and the payments made thereunder as summarized in Exhibit 17.   The Seaton Separation Agreement resulted in grossly excessive and undeserved compensation to be paid to Defendant Seaton and for Seaton to receive payments for stock held by him at a time when such stock was clearly worthless.

175.    As of November, 2003, the Debtors were collectively insolvent and/or within the "zone of insolvency" and were collectively unable to pay their debts as they came due. Furthermore, the Debtors were in default of their obligations under both the Senior Secured Facility and Senior Subordinated Notes.

176.    Pursuant to applicable state law, at the time that Defendants Chapman and Breckenridge authorized, directed and or negotiated the Seaton Separation Agreement and subsequently authorized payments to be made thereunder, the Debtors were insolvent or in the vicinity of the zone of insolvency such that Chapman and Breckenridge, individually and collectively, owed a fiduciary duty of loyalty and good faith to the creditors of the Debtors and obligation to manage the assets of the Debtors as a trust fund.

177.    In authorizing, directing and negotiating the Seaton Separation Agreement and subsequently authorizing the grossly excessive payments contemplated therein to be made to Defendant Seaton, Defendants Chapman and Breckenridge breached their fiduciary duties.

-39-

ATLANTA:4797743.1

178.    The Trustee respectfully prays for a judgment for compensatory damages against Defendants Chapman and Breckenridge, jointly and severally, for damages caused to the Debtors as a result of the Seaton Separation Agreement in an amount to be determined at the trial of this case, together with punitive damages, pre and post judgment interest, attorneys fees and costs.

## COUNT XIX
## AVOIDANCE OF MISCELLANEOUS PAYMENTS TO
## SEATON AS PREFERENTIAL TRANSFERS

179.    The Trustee realleges and incorporates each and every allegation set forth in paragraphs 1 through 72 above as if fully set forth herein.

180.    At the time ASPG purchased SRI in September 1996, ASPG did not purchase certain accounts receivable which had warranty claim issues associated with them.  Seaton and other founders/owners designated these as "Restricted Cash".  Since ASPG did not purchase these receivables when money was collected from these contracts the money was paid out to Seaton and the other former owners of SRI.   Payments of $23,784.23 were made to Seaton in October and November of 2003 in connection with "Restricted Cash" (the "Restricted Cash Payments").

181.    At all times relevant hereto, Seaton was an insider as defined in §101(31) of the Bankruptcy Code.

182.    The Restricted Cash Payments were made one year prior to the date on which SRI filed their respective bankruptcy petitions.

183.    The Restricted Cash Payments were (i) for the benefit of Seaton, a creditor of the Debtors; (ii) for or on account of antecedent debt then owed to Seaton, (iii) made while the Debtors were insolvent; (iv) within one year of the SRI petition date and (v) which enabled Seaton to receive more than Seaton would have received if this were a case under Chapter 7 of

-40-

the Bankruptcy Code, had the transfer not been made and Seaton received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

184.    Accordingly, the Trustee requests an Order from this Court avoiding the Restricted Cash Payments as preferential transfers pursuant to §547 of the Bankruptcy Code, for compensatory damages in the principal amount of $23,784.23, and pre and post-judgment interest and costs.

**COUNT XX**
**DEMAND FOR AN ACCOUNTING FROM SEATON WITH RESPECT TO USE OF COMPANY FUNDS AND REIMBURSEMENT OF PERSONAL EXPENSES AND FOR RETURN OF ALL IMPROPER PAYMENTS**

185.    The Trustee hereby realleges each and every allegation contained in paragraphs 1 through 72 above, inclusive.

186.    During the time that Seaton served as an officer and director of one or more of the Debtor corporations, he submitted voluminous requests for reimbursement of purported business related expenses charged through several personal credit cards held in his name (the "Seaton Credit Cards").

187.    Further, Seaton also had access to and used company credit cards (the "Debtor Credit Cards") to charge purported business related expenses.  According to the records currently available to the Trustee, Seaton charged both business and personal expenses on the company credit cards.

188.    In addition, Seaton requested and received numerous reimbursements for other expenses and cash advances.  In many cases, these requests were submitted without adequate documentation and without providing receipts for subsequent use.

189.    Finally, upon information and belief, Seaton used employees of the Debtors to perform personal services for him at his home and ranch and also used equipment and materials

-41-

owned by the Debtors for improvements at his home or ranch.  To the best of the knowledge, information and belief of the Trustee, the Debtors were never fully reimbursed for these services and materials.

190.    Although the Debtors attempted to itemize and accrue personal expenses incurred by Mr. Seaton using the Seaton Credit Cards and the Debtor Credit Cards, as well the other expenses requested by Seaton, in a separate account for Mr. Seaton, the records turned over to the Trustee with respect this account were incomplete.  It is also apparent to the Trustee that certain files related to this accounting are either or both incomplete and/or have been lost, removed or destroyed.  In addition, it is apparent to the Trustee that the Debtors, at a time when Seaton was an officer and director of the Debtors, maintained poor controls and records with respect to Seaton's claimed expenses and use of employees.  Based upon the information available to the Trustee, however, the Trustee is informed and believes that Seaton (i) claimed substantial amounts for reimbursement of expense for which the Debtors do not have receipts; (ii) was reimbursed twice for certain expenses; (iii) used company employees to provide personal services to him at his home or his ranch without reimbursing the Debtors; and (iv) charged the Debtors for work done on his personal residence.

191.    Accordingly the Trustee herewith demands an accounting from Seaton with respect to (i) each and every expense submitted by him to the Debtors from January 1, 2000 to and through the SRI Petition Date; (ii) the use of the Seaton Credit Cards for business expenses from January 1, 2000 to  and through the SRI Petition Date; and (iii) the value of services and materials provided to Seaton for use at his residence or ranch and which were paid for by the Debtors.

ATLANTA:4797743.1

192.    Upon completion of such accounting, the Trustee requests that a judgment be entered in his favor for the value of all reimbursements and benefits received by Seaton to the extent the value of such reimbursement and benefits exceed adjustments made prior to the SRI Petition Date.

**COUNT XXI**
**MISCELLANEOUS BREACHES OF FIDUCIARY DUTIES, NEGLIGENCE AND MISMANAGEMENT AGAINST DEFENDANTS SEATON, CHAPMAN AND BRECKENRIDGE JOINTLY AND SEVERALLY**

193.    The Trustee hereby realleges each and every allegation contained in paragraphs 1 through 72 above, inclusive.

194.    From and after the dates on which the Bridge Loans were initially made as set forth herein and to and through the execution of the Seaton Separation Agreement, Defendants Seaton, Chapman and Breckenridge owned or controlled a majority of the voting stock of ASPG, controlled and directed the Board of Directors of ASPG and were otherwise responsible for the financing, management, and operation of the Debtors.   Chapman and Breckenridge were responsible for the financing, management and operation of the Debtors from and after the Seaton Separation Agreement.

195.    During this entire time period, from approximately January 1, 2002 to and through the Petition Dates, the Debtors were collectively insolvent and/or within the "zone of insolvency".   Furthermore, at various points of time during this period, both before and after the 2002 Refinancing, the Debtors were in default of their obligations under both the Senior Secured Facility and Senior Subordinated Notes.

196.    Pursuant to applicable state law, during Defendants Seaton, Chapman and Breckenridge, individually and collectively, owed a fiduciary duty of loyalty and good faith to the Debtors and the creditors of the Debtors.

ATLANTA:4797743.1

197.    During this entire time period, the Trustee is informed and believes that Defendants Seaton, Chapman and Breckenridge breached and violated their fiduciary duties by knowingly and recklessly operating and managing the Debtors in a futile attempt to achieve a return on their respective investments in the Debtors.

198.    In addition to this breach of their fiduciary duties, Defendants Seaton, Chapman and Breckenridge intentionally, recklessly and/or negligently mismanaged the Debtors and caused substantial damage to the Debtors and their creditors.

199.    In particular, the Trustee is informed and advised that Defendants Seaton, Chapman and Breckenridge:

(1)    Failed to protect the interests of creditors as the Debtors' financial condition continued to deteriorate in 2002 and 2003;

(2)    Authorized additional secured and unsecured borrowing throughout 2002 and 2003 without identifying, addressing or resolving the causes of the continuing losses from operations;

(3)    Failed to ensure and provide for adequate capitalization of the Debtors;

(4)    Failed to sell either or both of AAI or SCI prior to the Petition Dates and in a manner which would have resulted in a much higher return than was achieved for these entities during the course of the bankruptcy case;

(5)    Engaged in numerous and confusing changes at the senior levels of management of the Debtors, particularly at SRI, which not only failed to resolve the apparent and well known operational and financial problems at SRI but which, in fact, only served to worsen SRI's operational and financial performance;

ATLANTA:4797743.1

(6)    Engaged is substantial changes of business strategy in connection with the changes of management which also failed to resolve the apparent and well known operational and financial problems at SRI and which, in fact, only served to worsen SRI's operational and financial performance

(7)    Engaged in petty disputes by and among each other which resulted in divisions and factions developing among members of the ASPG Board and within the employees of the Debtors which further worsened operating and financial results, particularly at SRI;

200.   The damage caused to the Debtors through the conduct of Seaton, Chapman and Breckenridge was such that, at present, it appears that the Mezzanine Lenders will receive only a fraction of what is owed to them pursuant to the Senior Subordinated Notes.  Further, pre-petition non-priority unsecured creditors of SRI will likely receive no distributions and the creditors of AAI and SCI will only receive small distributions.

201.   The Trustee respectfully prays for a judgment for compensatory damages against Defendants Seaton, Chapman and Breckenridge, jointly and severally, for all damages proximately caused by their breaches of fiduciary duty and/or mismanagement in an amount to be determined at the trial of this case together with punitive damages, pre- and post-judgment interest, attorneys fees and costs.

**COUNT XXII**
**DEEPENING INSOLVENCY AGAINST DEFENDANTS SEATON, CHAPMAN AND BRECKENRIDGE, JOINTLY AND SEVERALLY**

202.   The Trustee hereby realleges each and every allegation contained in paragraphs 1 through 72 above, and paragraphs 193 through 201, inclusive.

ATLANTA:4797743.1

203.     By causing the Debtors to expand their debt and prolong their corporate life while continuously insolvent, Defendants Seaton, Chapman and Breckenridge, deepened the insolvency of the Debtors resulting in further debts to an increased number of creditors, thereby reducing any potential recovery for its creditors in the Debtors' bankruptcy cases.

204.     Defendants Seaton's, Chapman's and Breckenridge's expansion of corporate debt was the proximate cause of damage to the Debtors and their creditors, in an amount to be proven at trial and for which damage they are jointly and severally liable.

205.     Based on the foregoing, this Court should enter a judgment against Defendants Seaton, Chapman and Breckenridge, in favor of Trustee for damages to the Debtors in an amount to be determined at trial, together with punitive damages, pre- and post-judgment interest and costs and attorneys fees.

## COUNT XXIII

### EQUITABLE SUBORDINATION OF SUBORDINATED NOTES AGAINST DEFENDANTS SEATON, ALLISON AND WEST

206.     The Trustee hereby realleges each and every allegation contained in paragraphs 1 through 72 above, inclusive.

207.     The Trustee is informed and believes that Seaton, Allison and West intend to seek or file claims against ASPG and perhaps certain other of the Debtors for the amounts purportedly owed to them pursuant to the Subordinated Promissory Notes.

208.     At the time the Subordinated Promissory Notes were issued to the Defendants in June, 2002, the Debtors were generally unable to pay their debts as they came due, the capitalization of the Defendant was inadequate, and the Debtors were insolvent.

209.     In accepting the issuance of new promissory notes coupled with the substantial cash payments received on the initial promissory notes issued to them in 1996, the actions of

ATLANTA:4797743.1

Seaton, Allison and West complained of herein constituted inequitable misconduct that harmed Defendants' creditors an/or unfairly benefited Seaton, Allison and West.

210.    The Trustee requests the entry of an order equitably subordinating any claims made by the Defendants arising under or related to the Subordinated Promissory Notes to the claims of all other creditors of any of the Debtors against which the Defendants may assert such claims and Seaton, Allison and West should not be permitted to receive any distribution on any of its claims against such Debtors before payment in full is made to all non-defendant creditors of such Debtors.

211.    The Trustee expressly reserves the right to amend and supplement these counts to the extent that Seaton, Allison and/or West file other claims against any of the Debtors not contemplated herein.

## COUNT XXIV
## EQUITABLE SUBORDINATION OF SEPARATION AGREEMENT
## CLAIMS AGAINST SEATON

212.    The Trustee hereby realleges each and every allegation contained in paragraphs 1 through 72 above, inclusive.

213.    In the event that this Court does not set aside or avoid the Separation Agreement as demanded above, and in order to avoid unfairness to other creditors of these Debtors, the Trustee requests the entry of an order equitably subordinating any claims made by the Seaton arising under or related to the Separation Agreement to the claims of all other creditors of any of the Debtors against which Seaton may assert such claims and Seaton should not be permitted to receive any distribution on any of his claims against such Debtors before payment in full is made to all non-defendant creditors of such Debtors.

214.    The Trustee expressly reserves the right to amend and supplement this Count to the extent that Seaton files other claims against any of the Debtors not contemplated herein.

-47-

ATLANTA:4797743.1

**COUNT XXV**
**EQUITABLE SUBORDINATION OF ALL CLAIMS HELD BY OR**
**WHICH MAY BE ASSERTED BY ANY OF THE DEFENDANTS HEREIN**

215.    The Trustee hereby realleges each and every allegation contained in paragraphs 1 through 72 above, inclusive.

216.    As of the filing of this Adversary Proceeding, the bar dates for filing claims in these case has not yet passed and the Trustee does not yet know what, if any claims, may be asserted against any of these Debtors by any of the Defendants herein.  In the event such claims are filed or asserted, the Trustee requests the entry of an order equitably subordinating any such claims to the claims of all other creditors of any of the Debtors against which such claims may be asserted and these Defendants should not be permitted to receive any distribution on any of their claims against such Debtors before payment in full is made to all non-defendant creditors of such Debtors.

217.    The Trustee expressly reserves the right to amend and supplement this Count to the extent that the Defendants file specific claims against any of the Debtors not contemplated herein.

WHEREFORE, the Trustee respectfully requests that he be granted the judgments and other relief as demanded in the individual counts and causes of action herein, that the costs of this action be cast against the Defendants jointly and severally and for such other and further relief as this Court may deem just and proper.

MCKENNA LONG & ALDRIDGE LLP

/s/ Henry F. Sewell, Jr.
Gary W. Marsh
Georgia Bar No.  471290
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Bryan E. Bates
Georgia Bar No. 140856

-48-

ATLANTA:4797743.1

303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
404-527-8120 (phone)
404-527-4198 (fax)
gmarsh@mckennalong.com
hsewell@mckennalong.com
bbates@mckennalong.com

Attorneys for Ronald L. Glass, Chapter 7
Trustee

ATLANTA:4797743.1